# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A14-1776

Nicol Nagel, individually and ESY Investments, LLC,
a California limited liability company,
Respondents,

vs.

Tracy A. Westen, et al.,
Appellants.

**Filed June 15, 2015**
**Affirmed**
**Larkin, Judge**

Hennepin County District Court
File No. 27-CV-14-3422

Christopher J. Knapp, David A. Orenstein, Barnes & Thornburg LLP, Minneapolis, Minnesota; and

Paul J. Laurin (pro hac vice) Barnes & Thornburg LLP, Los Angeles, California (for respondents)

Michael J. Orme, Dana K. Nyquist, Orme & Associates, Ltd., Eagan, Minnesota; and

Howard M. Spector (pro hac vice), Spector & Johnson, PLLC, Dallas, Texas (for appellants)

        Considered and decided by Schellhas, Presiding Judge; Larkin, Judge; and Minge, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**S Y L L A B U S**

A debt owed by a garnishee to an out-of-state garnishment debtor may be attached in Minnesota so long as (1) the garnishment debtor could sue the garnishee in an action on the debt in Minnesota, (2) Minnesota garnishment law authorizes the attachment, (3) a Minnesota court acquires jurisdiction over the garnishee, and (4) the exercise of jurisdiction comports with due process.

**O P I N I O N**

**LARKIN**, Judge

Appellant garnishment debtors challenge an order in garnishment proceedings granting respondent garnishment creditors' claim to funds in appellants' Ameriprise Financial Inc. brokerage account.[1]  Appellants argue that (1) the district court lacked jurisdiction over the garnishment action, (2) the district court's exercise of jurisdiction did not comport with due process, and (3) Minnesota's choice-of-law principles required application of Texas exemption law.  We affirm.

---

[1] In this opinion, we use the definitions set forth in Minnesota Statutes chapter 571 governing garnishment.  "'Creditor' means the party who has a claim for the recovery of money in the civil action whether that party is the plaintiff, defendant, or other party in the civil action and who is issuing or requesting the issuance of a garnishment summons." Minn. Stat. § 571.712, subd. 2(a) (2014).  "'Debtor' means a party against whom the creditor has a claim for the recovery of money in the civil action whether that party is the plaintiff, defendant, or other party in the civil action." *Id.*, subd. 2(b) (2014). "'Garnishee' means the third party upon whom the garnishment summons is served." *Id.*, subd. 2(c) (2014).  "'Claim' means the unpaid balance of the creditor's judgment against the debtor . . . ." *Id.*, subd. 2(d) (2014).

2

## FACTS

In February 2014, respondents Nicol Nagel and ESY Investments LLC, obtained a $4.5 million judgment against appellants Tracy A. Westen and Linda Lawson from a California court, based on appellants' failure to make material disclosures in connection with the sale of their Los Angeles home. Appellants, who moved to Texas in 2013, made no payments in satisfaction of the judgment. After garnishing less than $4,000 from appellants' Texas bank account, respondents docketed the judgment in jurisdictions across the United States, including Minnesota, "where they believe[d] [appellants held] assets."

Appellants have an investment account with Ameriprise Financial Inc. The record describes the account as a "Select Variable Annuity." In June 2014, respondents served Ameriprise with a garnishment summons at its Minneapolis headquarters, and Ameriprise provided respondents with nonearnings disclosure forms. The forms state that at "the time of service . . . there was due and owing [appellants] from [Ameriprise] . . . personal property, instruments, or papers belonging to [appellant Westen] and in the possession of [Ameriprise]," which Ameriprise described as, "[account number] Ameriprise Brokerage $547,645.14 Ownership: Tracy Westen and Linda Lawson, joint tenants Assets Held in an annuity within the brokerage account." In addition, the words "Money Market" are written next to the $547,645.14 figure on the forms. Ameriprise placed a hold on appellants' funds pending the outcome of the garnishment proceedings.

In July, appellants filed an exemption notice, claiming that all of the funds in their Ameriprise account "were exempt from execution because the funds were an 'accident,

3

disability, or retirement pension or annuity' under Texas exemption law." Appellants also moved to quash and dismiss the garnishment action, arguing that the district court lacked subject-matter and personal jurisdiction.

The district court held an evidentiary hearing regarding the jurisdictional and exemption issues. At the hearing, appellants presented testimony from an Ameriprise representative. The representative testified that Ameriprise Financial Inc., is a holding company, that "Ameriprise Financial Services is the broker," and that "[Ameriprise Financial Services] holds the brokerage account which holds the annuity" that is the subject of this garnishment action. The representative also testified that an Ameriprise subsidiary, River Source Life Insurance Company, issued the annuity, and that the account containing the annuity is "the only account that Ameriprise . . . is in control of [that is] subject to the writ" in this proceeding. The representative agreed that "the annuity is in the custody of Ameriprise."

Appellant Lawson also testified at the hearing. She explained that she and her husband purchased the annuity in 2011 at her broker's office in California and that she later interacted with Ameriprise through its broker in Dallas, Texas, where she and her husband moved in 2013. Lawson testified that she had never been to Minnesota before the hearing and that her husband had never been to Minnesota. She also testified that neither she nor her husband has ever owned property or a business in Minnesota, served as an officer or director of a Minnesota company, or opened a bank account in Minnesota.

4

The district court received an Ameriprise Brokerage Client Agreement dated May 2014. The client agreement explains the role of the "Introducing Broker and Clearing Broker."

> Your Introducing Broker and the Clearing Broker have an agreement in which the Introducing Broker introduces customer accounts to the Clearing Broker on a fully disclosed basis. This means that the Introducing Broker is responsible for opening, approving and monitoring your account and for accepting securities orders. The Clearing Broker will provide recordkeeping, delivery and receipt of securities and funds; receive and distribute payments thereof; and safeguard all funds and securities received. The Clearing Broker also receives and distributes dividends and other distributions and processes exchange offers, rights offerings, warrants, tender offers and redemptions.

The client agreement contains a notice provision that states, "You may contact us using the following address and telephone number" and lists Ameriprise's Minneapolis, Minnesota address and an 800 telephone number. Another provision states, "You may contact us using [Ameriprise's Minneapolis, Minnesota address and 800 telephone number]. You may also write to us at the Introducing Broker location identified on the client application."

The client agreement also sets forth three provisions regarding the "Governing Law," "Disputes," and "predispute arbitration." The first provides that:

> THIS AGREEMENT AND ITS ENFORCEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF MINNESOTA WITHOUT GIVING EFFECT TO ITS CHOICE OF LAW OR CONFLICTS OF LAW PRINCIPLES, UNLESS SUPERSEDED BY FEDERAL LAW OR STATUTE; AND SHALL COVER INDIVIDUALLY AND COLLECTIVELY ALL BROKERAGE ACCOUNTS WHICH YOU MAY OPEN OR

5

REOPEN WITH US, OR WHICH MAY BE INTRODUCED TO US, INCLUDING OUR SUBSIDIARIES AND AFFILIATES, THROUGH THE COURTESY OF THE AFOREMENTIONED INTRODUCING BROKER.

The second provides that:

In the event of a dispute regarding the Account, you agree to resolve the dispute by looking to this Agreement. You agree that this Agreement is the complete and exclusive statement of the Agreement between us and you which supersedes any proposal or prior agreement, oral or written, and any other communications between us relating to the subject matter of this Agreement.

And the third provides that "**The parties agree that venue and personal jurisdiction is proper in Minneapolis, Minnesota.**"

After the hearing on appellants' motion, the district court issued its findings of fact, conclusions of law, and order. The district court noted that "none of the parties [question] the validity of the underlying California judgment" and that the district court was required to provide full faith and credit to that judgment. The district court described its exercise of jurisdiction as "in rem" and concluded that "the property at issue, [appellants'] Ameriprise funds, is located within Minnesota [because] Ameriprise has headquarters in [Minnesota]." The district court further concluded that appellants could "reasonably foresee being subjected to jurisdiction in Minnesota," based on the Ameriprise client agreement. The district court reasoned that the agreement "listed Minnesota as the venue to resolve disputes between the parties, and [appellants] received numerous account statements from Ameriprise listing its Minneapolis, Minnesota address."

6

The district court ruled that its "exercise of jurisdiction to garnish [appellants']
Ameriprise funds [was] proper" and that it "must apply Minnesota exemption law." The
district court also ruled that appellants' "attempt to exempt their entire Ameriprise fund
from [respondents] is improper" and that only $69,000 of the funds are exempt under
Minn. Stat. § 550.37, subd. 24 (2014). The district court therefore granted respondents'
claim to the funds in appellants' Ameriprise account, subject to the $69,000 exemption.

This appeal follows.

## ISSUES

I.    Did the district court have jurisdiction over respondents' garnishment
action?

II.   Did the district court's exercise of jurisdiction comport with due process?

III.  Did the district court err by applying Minnesota exemption law?

## ANALYSIS

### I.

We first consider whether the district court had jurisdiction over respondents'
garnishment action. Appellants argue that the district court lacked "subject matter
jurisdiction over the annuity."

*Jurisdictional Principles in General*

"The existence of jurisdiction is a question of law that we review de novo." *In re
John Ward Gillman Engraved June 20, 1775 Copper Printing Plate*, 806 N.W.2d 861,
864 (Minn. App. 2011) (quotation omitted). Jurisdiction is of two types: subject-matter
and personal. Subject-matter jurisdiction refers to a court's authority to hear the type of

7

dispute at issue and to grant the type of relief sought. *Williams v. Smith*, 820 N.W.2d 807, 812-13 (Minn. 2012). "Jurisdiction of the subject matter means authority to hear and determine a particular class of actions and the particular questions which the court assumes to decide." *Robinette v. Price*, 214 Minn. 521, 526, 8 N.W.2d 800, 804 (1943). "Put differently, subject matter jurisdiction is a court's 'statutory or constitutional *power* to adjudicate the case.'" *Giersdorf v. A & M Constr., Inc.*, 820 N.W.2d 16, 20 (Minn. 2012) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89, 118 S. Ct. 1003, 1010 (1998)).

The scope of the district court's authority in this case is set forth under the Minnesota Constitution and relevant statutes. District courts have "original jurisdiction in all civil and criminal cases." Minn. Const. art. VI, § 3. More specifically, Minnesota Statutes sections 571.71 to .932 (2014) empower district courts to adjudicate garnishment actions. Thus, the district court had subject-matter jurisdiction.

Subject-matter jurisdiction is distinguishable from personal jurisdiction, which is likely the exercise of jurisdiction that appellants intend to challenge in this appeal.[2]

---

[2] We acknowledge our supreme court's conflicting treatment of in rem jurisdiction as both subject-matter and personal jurisdiction.

> Our cases have not always been clear as to the classification of matters that involve subject matter jurisdiction and, more specifically, whether in rem jurisdiction should be treated more like subject matter jurisdiction or personal jurisdiction. *Compare In re Florance*, 360 N.W.2d 626, 629 n.1 (Minn. 1985) (discussing in rem jurisdiction in the context of the court's subject matter jurisdiction), *with Hoff v. Kempton*, 317 N.W.2d 361, 365 n.5 (Minn. 1982) (expressing our understanding that in rem jurisdiction is commonly grouped

"Subject-matter jurisdiction defines the court's authority to hear a given type of case, whereas personal jurisdiction protects the individual interest that is implicated when a nonresident defendant is haled into a distant and possibly inconvenient forum." *United States v. Morton*, 467 U.S. 822, 828, 104 S. Ct. 2769, 2773 (1984) (citing *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701-03 & n.10, 102 S. Ct. 2099, 2104-05 & n.10 (1982)). Personal jurisdiction is commonly thought to encompass jurisdiction in personam and in rem. *Hoff*, 317 N.W.2d at 365 n.5.

> A judgment in personam imposes a personal liability or obligation on one person in favor of another. A judgment in rem affects the interests of all persons in designated property. A judgment quasi in rem affects the interests of particular persons in designated property. The latter is of two types. In one the plaintiff is seeking to secure a pre-existing claim in the subject property and to extinguish or establish the nonexistence of similar interests of particular persons. In the other the plaintiff seeks to apply what he concedes to be the property of the defendant to the satisfaction of a claim against him.

*Hanson v. Denckla*, 357 U.S. 235, 246 n.12, 78 S. Ct. 1228, 1235 n.12 (1958). "An attachment is in the nature of proceedings in rem, the res being the debt or other property attached . . . ." *Harvey v. Great N. Ry.*, 50 Minn. 405, 407, 52 N.W. 905, 906 (1892).

---

> "under the rubric of 'personal jurisdiction'"). . . . Notwithstanding our efforts in recent years to distinguish procedural tools from jurisdictional limits, *see, e.g.*, *In re Civil Commitment of Giem*, 742 N.W.2d 422, 427-29 (Minn. 2007), there is a need for further clarification of our jurisprudence on subject matter jurisdiction.

*In re Petition for Instructions to Construe Basic Resolution 876*, 772 N.W.2d 488, 496 (Minn. 2009) (Dietzen, J., concurring).

Under the authorities discussed above, the garnishment action in this case involved an exercise of in rem jurisdiction. The question remains whether Minnesota had in rem jurisdiction. We turn to that issue.

*The Jurisdictional Rule Governing Attachment of Debts*

"The basis of [in rem] jurisdiction is the presence of the subject property within the territorial jurisdiction of the forum State. . . . Tangible property poses no problem for the application of this rule, but the situs of intangibles is often a matter of controversy." *Denckla*, 357 U.S. at 246-47, 78 S. Ct. at 1228, 1236. A debt is property that may serve as the basis for in rem jurisdiction. *Harvey*, 50 Minn. at 405, 52 N.W. at 905. And the jurisdictional rule in Minnesota has long been that a debt owed by a garnishee to an out-of-state garnishment debtor may be attached in Minnesota so long as (1) the garnishment debtor could sue the garnishee in an action on the debt in Minnesota, (2) Minnesota garnishment law authorizes the attachment, and (3) a Minnesota court acquires jurisdiction over the garnishee. *See id.* ("For the purposes of attachment, a debt has a situs wherever the debtor [(garnishee)] can be found. Wherever the creditor [(garnishment debtor)] might sue for its recovery, there it may be attached as his property, provided the laws of the forum authorize it.").

The Minnesota Supreme Court summarized the jurisdictional rule in *Templeton v. Van Dyke*, stating:

> A debt has a situs wherever the debtor [(garnishee)] can be found.
> Wherever the creditor [(garnishment debtor)] might sue for its recovery, there it may be reached by garnishment as his property.

> This may be done in an action in rem even though all parties are nonresidents of the state, it being immaterial where the debt was contracted or incurred.

169 Minn. 188, 210 N.W. 874 (1926).

*Templeton* explains that a garnishment creditor acts as the "representative" of the garnishment debtor. *Id.* at 193, 210 N.W. at 876. "If [the garnishment debtor] himself has the right to prosecute an action to recover the debt in this state, . . . his representative has the same right as representing him and may garnish or attach the debt provided he complies with the law of the forum." *Id.* As the Minnesota federal district court explained when discussing *Templeton,* "debt" is simply a way of characterizing the funds that a garnishee holds for a judgment debtor, and the garnishee is indebted to the judgment debtor in the amount of those funds. *Elliot & Callan, Inc. v. Crofton*, No. 07-CV-3391, 2009 WL 3297506, at *3 (D. Minn. Oct. 13, 2009).

Several states follow a jurisdictional rule similar to Minnesota's. *See, e.g.*, *Levi Strauss & Co. v. Crockett Motor Sales, Inc.*, 739 S.W.2d 157, 158 (Ark. 1987) ("[T]he situs of a debt for purposes of garnishment, is not only at the domicile of the debtor, but in any state in which the garnishee may be found, provided the law of that state permits the debtor to be garnished, and provided the court acquires jurisdiction over the garnishee . . . ."); *Garrett v. Garrett*, 490 P.2d 313, 315 (Colo. App. 1971) (holding that a debt owed to a nonresident could be garnished if the court properly acquired jurisdiction over the garnishee and if the nonresident himself could have sued on the debt in the state); *Fraser v. Collier Constr. Co.*, 298 N.W. 313, 316-17 (Mich. 1941) ("By great weight of judicial opinion, the jurisdictional test for garnishment is the suability of the garnishee

11

defendant by the principal defendant in the jurisdiction where the garnishment is instituted." (quotation omitted)); *State ex rel. Fielder v. Kirkwood*, 138 S.W.2d 1009, 1011 (Mo. 1940) ("It is well settled that a debt may be attached wherever the creditor might maintain a suit to recover it.").

Moreover, Minnesota's jurisdictional rule is consistent with United States Supreme Court precedent. In 1899, the United States Supreme Court explained:

> The essential service of foreign attachment laws is to reach and arrest the payment of what is due and might be paid to a nonresident to the defeat of his creditors. To do it, you must go to the domicile of his debtor [(the garnishee)], and can only do it under the laws and procedure in force there. This is a legal necessity, and considerations of situs are somewhat artificial. If not artificial, whatever of substance there is must be with the [garnishee]. He, and he only, has something in his hands. That something is the res, and gives character to the action, as one in the nature of a proceeding in rem.
>
> To ignore this is to give immunity to debts owed to nonresident [garnishment debtors] from attachment by their [garnishment] creditors, and to deny necessary remedies.

*Chi., R.I. & P. Ry. v. Sturm*, 174 U.S. 710, 715-16, 19 S. Ct. 797, 799-800 (1899) (citation omitted).

In *Harris v. Balk*, the United States Supreme Court summarized the jurisdictional rule as follows:

> If there be a law of the state providing for the attachment of the debt, then, if the garnishee be found in that state, and process be personally served upon him therein, we think the court thereby acquires jurisdiction over him, and can garnish the debt due from him to the [garnishment] debtor of the [garnishment creditor], and condemn it, provided the garnishee could himself be sued by [the garnishment debtor] in that state. We do not see how the question of jurisdiction *vel non* can properly be made to depend upon the so-called

12

original situs of the debt . . . . Power over the person of the garnishee confers jurisdiction on the courts of the state where the writ issues. If . . . [the garnishment debtor] might sue [the garnishee] there and recover the debt, then he is liable to process of garnishment, no matter where the situs of the debt was originally. We do not see the materiality of the expression 'situs of the debt,' when used in connection with attachment proceedings. . . . It is nothing but the obligation to pay which is garnished or attached. . . . In such case the situs is unimportant. It is not a question of possession in the foreign state, for possession cannot be taken of a debt or of the obligation to pay it, as tangible property might be taken possession of. Notice to the [garnishee] of the commencement of the suit, and notice not to pay to [the garnishment debtor], is all that can be given. . . . [The garnishee's] obligation to pay to [the garnishment debtor] is thereby arrested, and a lien created upon the debt itself. We can see no reason why the attachment could not be thus laid, provided the [garnishment debtor] could himself sue in that state, and its laws permitted the attachment.

198 U.S. 215, 222-23, 25 S. Ct. 625, 626-27 (1905) (citations omitted).

Like the Minnesota Supreme Court in *Templeton*, the *Harris* Court explained:

The [garnishment creditor] in such proceeding in the foreign state is able to sue out the attachment and attach the debt due from the garnishee to [the garnishment debtor], because of the fact that the [garnishment creditor] is really, in such proceeding, a representative of the [garnishment debtor], and therefore if such [garnishment debtor] himself had the right to commence suit to recover the debt in the foreign state, his representative has the same right, as representing him, and may garnish or attach the debt, provided the municipal law of the state where the attachment was sued out permits it.

*Id.* at 226, 25 S. Ct. at 628.

However, the United States Supreme Court later qualified the jurisdictional rule governing attachment of debts in *Shaffer v. Heitner*, holding that "all assertions of state-court jurisdiction must be evaluated according to the [due-process] standards set forth in

13

*International Shoe* and its progeny." 433 U.S. 186, 212, 97 S. Ct. 2569, 2584 (1977) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 66 S. Ct. 154 (1945)). In explaining its decision, the Court discussed *Harris* and stated that, in the future, a jurisdictional determination based on *Harris* must include a due-process analysis under *International Shoe*. *Id.* at 200-01, 97 S. Ct. at 2577-78. But the Court did not expressly overrule *Harris*. Instead, the Court stated, "It would not be fruitful for us to re-examine the facts of cases decided on the rationale[] of . . . *Harris* to determine whether jurisdiction might have been sustained under the standard we adopt today. To the extent that prior decisions are inconsistent with this standard, they are overruled." *Id.* at 212 n.39, 97 S. Ct. at 2584 n.39.

In sum, Minnesota's long-standing jurisdictional rule governing attachment of debts remains valid today, but the exercise of such jurisdiction must be consistent with due process. We next turn to application of that jurisdictional rule in this case. Section II of this opinion contains a complete due-process analysis.

*Application of the Jurisdictional Rule Governing Attachment of Debts*

In applying the jurisdictional rule governing the attachment of debts, we first consider whether appellants' Ameriprise account is a "debt" within the meaning of the rule. *Templeton* involved a promissory note. 169 Minn. at 189, 210 N.W. at 875. *Harris* involved a verbal promise to pay and spoke of "ordinary debts." 198 U.S. at 216-17, 223, 25 S. Ct. at 625, 626. In this case, appellants contend that "[t]he garnished property consists entirely of annuities." The record is somewhat unclear regarding that contention. Ameriprise disclosed that "there was due and owing" appellants from Ameriprise

14

$547,645.14, which it described both as "Money Market" and as "[h]eld in an annuity."

But because treating appellants' Ameriprise account as an annuity does not change our

analysis, we assume that the account consists of annuities.

On this point, appellants argue:

> The [district court] erroneously relied on *Templeton v. Van Dyke* for the proposition that a debt has a situs "wherever the debtor or his property can be found." *Templeton*'s holding involved a bank account, and a bank account is an entirely different type of asset than an annuity, as reflected by the UCC's different categorization of these assets. Bank accounts are classified as "accounts" or "deposit accounts," while annuities are classified as "general intangibles." . . . [Appellants] respectfully submit that the [district court's] decision to utilize the situs rule for an account or a debt and to follow *Templeton* constituted error as a matter of law.

Appellants' argument based on Uniform Commercial Code (U.C.C.)

classifications is unpersuasive. The U.C.C. governs consensual commercial transactions.

Minn. Stat. § 336.1-103(a) (2014). Appellants do not cite authority indicating that the

U.C.C. applies to garnishment actions. We therefore rely on commonly understood

definitions of the relevant terms, instead of the U.C.C., when determining whether an

annuity is properly treated as a debt for purposes of the jurisdictional rule.

An annuity is defined as "[a]n obligation to pay a stated sum . . . to a stated

recipient." *Black's Law Dictionary* 105 (9th ed. 2009). A debt is defined as a "[l]iability

on a claim; a specific sum of money due by agreement or otherwise." *Id.* at 462. The

Court of Appeals of Arizona relied on those definitions to treat annuity payments by an

insurer to a beneficiary as a debt for the purpose of determining jurisdiction to issue a

writ of garnishment compelling the insurer to remit future annuity payments to the

15

beneficiary's garnishment creditor.  *Ellsworth Land & Livestock, Inc. v. Bush*, 233 P.3d 655, 657-58 (Ariz. Ct. App. 2010).  The beneficiary argued that the trial court did not have jurisdiction to grant the writ because the insurer did not possess any property within Arizona that was owed to the beneficiary.  *Id.* at 656.  The garnishment creditor argued that the annuity constituted a "debt" and that the "debt" could be garnished under the Restatement (Second) of Conflict of Laws § 68 (1971), which provides:

> In contrast to chattels . . . only two requirements must be met to permit the garnishment of a debt.  First, maintenance of the action must be authorized by a statute . . . . Second, the state must have judicial jurisdiction over the garnishee . . . . There is no other requirement, as in the case of chattels, relating to the situs of the thing.

*Id.* at 657 (quoting Restatement (Second) of Conflict of Laws § 68 cmt. b).

The Court of Appeals of Arizona concluded that the writ of garnishment was properly examined under section 68 of the Restatement, based on the definitions of "annuity" and "debt" in *Black's Law Dictionary*.  *Id.*  The court held that, because the annuity was a "debt" and because the insurer was subject to personal jurisdiction in Arizona, the trial court had jurisdiction to issue the writ of garnishment.  *Id.* at 658.

We are influenced by the logical approach of the Court of Appeals of Arizona.  And we do not discern a meaningful distinction among the promissory note in *Templeton*, the verbal promise to pay in *Harris*, and the annuity in this case.  Each involves an obligation to pay a stated sum.  We therefore conclude that the annuity in this case is a "debt" for purposes of the jurisdictional rule governing attachment of debts.

16

Appellants argue that the annuity in their Ameriprise account is not a "debt" owed by Ameriprise, because River Source Life Insurance Company issued the annuity contract, and not Ameriprise. Appellants therefore argue that River Source owes the debt associated with their Ameriprise account, and not Ameriprise. We are not persuaded. River Source is a subsidiary of Ameriprise, and Ameriprise Financial Services holds the account that holds the annuity. Ameriprise's representative testified that Ameriprise "is in control of" the account and that "the annuity is in the custody of Ameriprise." Lastly, Ameriprise Financial Inc. disclosed that "there was due and owing [appellants] from [Ameriprise]" $547,645.14, "[h]eld in an annuity within the brokerage account." On this record, we conclude that the debt associated with appellants' Ameriprise account is owed by Ameriprise.

Under the jurisdictional rule governing attachment of debts, if appellants had the right to sue Ameriprise in an action regarding their account in Minnesota, respondents, as appellants' representatives, had the same right and could attach the account, so long as Minnesota law authorized the attachment and Ameriprise was subject to the district court's jurisdiction. There is no dispute that appellants could sue Ameriprise in Minnesota. Like the garnishment debtor in *Harris*, appellants are "entitled to all the privileges and immunities of citizens of the several states, one of which is the right to institute actions in the courts of another state." 198 U.S. at 223, 25 S. Ct. at 627. Moreover, Ameriprise's account was subject to attachment under Minnesota law. *See* Minn. Stat. § 571.73, subd. 3(2) (2014) (stating that the service of a garnishment summons attaches all nonexempt "indebtedness, money, or other property due or

17

belonging to the [garnishment] debtor and owing against the garnishee . . . whether or not the same has become payable.") Lastly, there is no dispute that Ameriprise was subject to the district court's jurisdiction or that Ameriprise was validly served.

Because appellants could have sued Ameriprise in an action regarding their account in Minnesota, Minnesota law authorized attachment of the account, and Ameriprise was subject to the district court's jurisdiction, the district court had in rem jurisdiction under the jurisdictional rule governing attachment of debts.

**II.**

We next consider whether Minnesota's exercise of in rem jurisdiction satisfied due process. Appellants contend that their "defenses to the garnishment cannot be litigated in Minnesota without violating due process standards." We review this jurisdictional issue de novo. *In re John Ward Gillman*, 806 N.W.2d at 864 (Minn. App. 2011); *see also Juelich v. Yamazaki Mazak Optonics Corp.*, 682 N.W.2d 565, 569-70 (Minn. 2004) (applying de novo review to a due-process analysis under *International Shoe*).

*Shaffer* held that "all assertions of state-court jurisdiction must be evaluated according to the standards set forth in *International Shoe* and its progeny." 433 U.S. at 212, 97 S. Ct. at 2584. The holding was a departure from the United States Supreme Court's earlier jurisprudence, which did not require a due-process analysis of exercises of in rem jurisdiction. *Id.* at 200, 205-06, 97 S. Ct. at 2577, 2580-81. The Court in *Shaffer* explained that, historically, the presence of property in a state was a sufficient basis for the state to exercise jurisdiction over the property. 433 U.S. at 211-12, 97 S. Ct. at 2583-

18

In ruling that the presence of property alone would no longer be sufficient and that such exercises of jurisdiction must comport with due process, the Court noted:

> The primary rationale for treating the presence of property as a sufficient basis for jurisdiction to adjudicate claims over which the State would not have jurisdiction if *International Shoe* applied is that a wrongdoer "should not be able to avoid payment of his obligations by the expedient of removing his assets to a place where he is not subject to an in personam suit."

*Id.* at 210, 97 S. Ct. at 2582 (quoting Restatement (Second) of Conflict of Laws § 66 cmt. a (1971)).

The *Shaffer* Court rejected that rationale as a basis for forgoing a due-process analysis in such cases. *Id.*, 97 S. Ct. 2582-83. However, the Court did not foreclose any possibility of exercising jurisdiction. Instead, it stated:

> [A] State in which property is located should have jurisdiction to attach that property, by use of proper procedures, as security for a judgment being sought in a forum where the litigation can be maintained consistently with *International Shoe*. . . . [W]e know of nothing to justify the assumption that a [garnishment] debtor can avoid paying his obligations by removing his property to a State in which his [garnishment] creditor cannot obtain personal jurisdiction over him. The Full Faith and Credit Clause, after all, makes the valid in personam judgment of one State enforceable in all other States.

*Id.*, 97 S. Ct. at 2583 (footnotes and citation omitted). Thus, *Shaffer* does not preclude Minnesota's exercise of in rem jurisdiction in respondents' action to collect on their judgment against appellants. In fact, *Shaffer* speaks favorably of such an exercise of jurisdiction, so long as it satisfies the minimum-contacts standard of *International Shoe*. *Id.* at 212, 97 S. Ct. at 2584.

19

As to that standard, *Shaffer* notes certain circumstances that would weigh against an exercise of in rem jurisdiction. For example, the Court stated that due process would be compromised where the property that serves as the basis for state-court jurisdiction is "completely unrelated to the plaintiff's cause of action" and "the only role played by the property is to provide the basis for bringing the defendant into court." *Id.* at 209, 97 S. Ct. at 2582. Those were the circumstances in *Shaffer*: the plaintiffs used a Delaware sequestration statute to confer quasi in rem jurisdiction on a Delaware court so that court could determine the rights between the parties as an original matter. *Id.* at 190, 194, 208-09, 97 S. Ct. at 2572, 2574, 2582.

Unlike *Shaffer*, this case involves a postjudgment exercise of in rem jurisdiction, in which respondents attempt to enforce appellants' existing obligation. Unlike the res in *Shaffer*, Ameriprise's debt to appellants is the subject of respondents' garnishment action and its role in the litigation is not merely to bring appellants into Minnesota court. In *Shaffer*, the Supreme Court suggested, in dicta, that its treatment of such a postjudgment in rem action might differ from its treatment of prejudgment actions, stating:

> [o]nce it has been determined by a court of competent jurisdiction that the defendant is a debtor of the plaintiff, there would seem to be no unfairness in allowing an action to realize on that debt in a State where the defendant has property, whether or not that State would have jurisdiction to determine the existence of the debt as an original matter.

*Id.* at 210 n.36, 97 S. Ct. at 2583 n.36 (note 36).

We are not aware of Minnesota caselaw addressing the extent to which *Shaffer* imposes due-process limitations on postjudgment collection proceedings. But other

20

courts have held that a state need not establish minimum contacts with a judgment debtor to garnish property held by the debtor in the state where the garnishment action is filed. For example, New York's intermediate appellate court concluded, based on note 36 from *Shaffer*, that New York did not need personal jurisdiction over a foreign judgment debtor to enforce a foreign judgment in New York. *Lenchyshyn v. Pelko Electric, Inc.*, 281 A.D.2d 42, 47-48 (N.Y. App. Div. 2001). The *Lenchyshyn* court noted that "[t]hose courts that have cited the *Shaffer* footnote have held uniformly that no jurisdictional basis for proceeding against the judgment debtor need be shown before a foreign judgment will be recognized or enforced in a given state." *Id*. at 48 (collecting cases).

The Court of Appeals of Arizona has also recognized the difference between the prejudgment action in *Shaffer* and a postjudgment action to enforce a debt, citing note 36 and concluding, "The California court having had *in personam* jurisdiction over both parties, its judgment . . . is entitled to full faith and credit in any state . . . and there is no unfairness in allowing the [judgment creditor] to realize on that debt in Arizona where the [judgment debtor] has property, whether or not the Arizona court would have jurisdiction to determine the existence of the debt as an original matter." *Huggins v. Deinhard*, 654 P.2d 32, 36-37 (Ariz. Ct. App. 1982) (citing *Shaffer*, 433 U.S. at 210 n.36, 97 S. Ct. at 2583 n.36).

The Supreme Court of Connecticut considered note 36 from *Shaffer* in *Bank of Babylon v. Quirk*, 472 A.2d 21, 22-23 (Conn. 1984). In that case, the defendant argued "that due process requires the existence of minimum contacts even in cases involving the enforcement of judgments from sister states." *Id.* at 22. The court rejected that

21

argument, quoted note 36, and found "no violation of [the] right to due process," explaining that:

> To follow the defendant's reasoning one would be obliged to recognize a tension between the full faith and credit and the due process clauses of the constitution of the United States. But there is no such tension. Due process is an essential ingredient in any valid judgment. Having been given fair notice and an opportunity to defend the action on the merits in the state of New York, the defendant cannot be heard to complain because the plaintiff seeks to enforce that judgment against any of his property situated in this state.

*Id*. at 22-23.

In a final example, the Supreme Court of Vermont explained that *Shaffer* involved "a suit upon an original, unadjudicated claim [and] not a suit upon a judgment." *Berger v. Berger*, 417 A.2d 921, 922 (Vt. 1980). The court further explained that the United States Supreme Court was "careful to note . . . that the Full Faith and Credit Clause makes the valid in personam judgment of one state enforceable in all other states." *Id*. The Vermont Supreme Court quoted note 36 and stated, "[r]ecognizing that, under the facts in *Shaffer*, the footnote in question is dicta, we are nonetheless inclined to follow it. There is nothing in the concept of justice and fair play that requires a second opportunity to litigate the liability established by a valid judgment." *Id*.

In sum, several states have relied on note 36 from *Shaffer* to hold that an exercise of in rem jurisdiction to enforce a foreign judgment does not offend due process. We question whether a postjudgment enforcement action can be held to satisfy due process without consideration of the *International Shoe* standard. Once again, *Shaffer* requires that "*all* assertions of state-court jurisdiction must be evaluated according to the standard

set forth in *International Shoe* and its progeny." *Shaffer*, 433 U.S. at 212, 97 S. Ct. at 2584 (emphasis added). The only possible exception that the Supreme Court recognized was when no other forum is available to the plaintiff. *Id*. at 211 n.37, 97 S. Ct. at 2583 n.37 ("This case does not raise, and we therefore do not consider, the question whether the presence of a defendant's property in a State is a sufficient basis for jurisdiction when no other forum is available to the plaintiff.").

However, we agree with the reasoning of the courts discussed above: there is a significant difference between the prejudgment exercise of in rem jurisdiction in *Shaffer* and a postjudgment, in rem enforcement action. Here, the district court exercised jurisdiction over appellants' interests in particular property to satisfy an existing judgment, the validity of which is not contested. The district court did not exercise jurisdiction to determine the rights between appellants and respondents in the first instance. Contacts that would be insufficient to satisfy due process in the latter situation might be sufficient in the former situation. *See Rush v. Savchuk*, 444 U.S. 320, 332, 100 S. Ct. 571, 579 (1980) ("If a defendant has certain judicially cognizable ties with a State, a variety of factors relating to the particular cause of action may be relevant to the determination whether the exercise of jurisdiction would comport with 'traditional notions of fair play and substantial justice.'").

Keeping the postjudgment context of the underlying garnishment action in mind, we turn to the *International Shoe* standard, which requires that a defendant have "minimum contacts" with a forum state such that maintaining jurisdiction there does not offend "traditional notions of fair play and substantial justice." 326 U.S. at 316, 66 S. Ct.

23

at 158 (quotation omitted). There must be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Denckla*, 357 U.S. at 253, 78 S. Ct. at 1240. The defendant must "reasonably anticipate" the possibility of being brought into the forum state's courts. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 567 (1980).

We note that appellants opened their Ameriprise account in 2011 and received correspondence from Ameriprise that identified a Minneapolis, Minnesota address for Ameriprise. For example, the record contains an Ameriprise Achiever Circle Elite Portfolio Review regarding the status of appellants' account in May 2014. The document identified appellants' personal advisor as Mark Cannon of Jones, Cannon and Associates, described as "A financial advisory practice of Ameriprise Financial Services, Inc." located in Texas. However, the Portfolio Review invited appellants to use Ameriprise's 24-hour automated service to obtain information such as account values, and it directed appellants to contact Ameriprise Financial Services Inc., at its Minneapolis address and 800 telephone number regarding "other questions or concerns."

The record also contains the May 2014 Ameriprise Brokerage Client Agreement, on which the district court relied to conclude that appellants should have reasonably foreseen that their Ameriprise account "may be subject to jurisdiction in Minnesota as a result of their business relationship with Ameriprise." Appellants contend that the district court's reliance on the client agreement was erroneous, arguing that the document was

24

not signed by appellants or Ameriprise and that it postdates the opening of appellants' account.[3]

In district court, respondents argued that appellants produced the client agreement in response to respondents' postjudgment discovery requests. The district court received the client agreement based on that representation. The first line of text in the client agreement states, "Provide this form to the client," and the agreement authorizes Ameriprise to "modify or change the terms and conditions of [the] Agreement by mailing a written notice of the modification or change or a new printed Agreement" to the account holder. This record reasonably supports the district court's finding that the client agreement received into evidence is "[t]he account agreement between [appellants] and Ameriprise." *See Rasmussen v. Two Harbors Fish Co.*, 832 N.W.2d 790, 797 (Minn. 2013) (stating that appellate courts review the district court's factual findings for clear error, examining the record to determine if it contains reasonable evidence to support the district court's findings).

The client agreement notified appellants that (1) they may contact Ameriprise at its Minneapolis, Minnesota address, (2) the agreement and its enforcement shall be governed by Minnesota law, and (3) "venue and personal jurisdiction is proper in Minneapolis, Minnesota." In sum, appellants were on notice that Ameriprise is a

---

[3] Appellants also assert that "the unauthenticated document was erroneously admitted into evidence," but they do not provide supporting legal authority or argument. The assertion therefore is waived. *See State v. Modern Recycling, Inc.*, 558 N.W.2d 770, 772 (Minn. App. 1997) ("An assignment of error based on mere assertion and not supported by any argument or authorities in appellant's brief is waived and will not be considered on appeal unless prejudicial error is obvious on mere inspection." (quotation omitted)).

Minnesota company, Ameriprise invited communications through its Minneapolis headquarters, and Ameriprise expected that any dispute regarding the account would be litigated under Minnesota law and that venue and personal jurisdiction would be proper in Minnesota. Thus, appellants chose to create and maintain a business relationship with a Minnesota company that expected to conduct the relationship in Minnesota.

Appellants argue that, even if the client agreement contemplated Minnesota as a proper venue, "that forum choice only applied to disputes between Ameriprise and [appellants]." Appellants argue that they could not "reasonably foresee litigating with third parties such as the respondents (as opposed to only with [Ameriprise]) in Minnesota." We are not persuaded. The due-process inquiry asks whether appellants could reasonably anticipate the possibility of being brought into Minnesota's courts. *World-Wide Volkswagen*, 444 U.S. at 297, 100 S. Ct. at 567. Based on appellants' knowledge of Ameriprise's connection to Minnesota, appellants reasonably should have anticipated having to litigate a dispute regarding their Ameriprise account in Minnesota, including a dispute with a third party.

In conclusion, we are influenced by the United States Supreme Court's indication in *Shaffer* that it did not intend a due-process analysis to foreclose in rem jurisdiction in actions to collect on a judgment. An effective judicial process requires that judgments be enforceable. Although appellants' contacts with Minnesota may be limited, we are satisfied that Minnesota's exercise of in rem jurisdiction to enforce respondents' existing foreign judgment comports with due process. By opening and maintaining their Ameriprise account, appellants engaged in purposeful activity related to Minnesota that

26

makes the district court's postjudgment exercise of in rem jurisdiction fair, just, and reasonable. We do not suggest that respondents could garnish and attach appellants' Ameriprise account, consistent with due process, in any state where Ameriprise does business. *See Rush*, 444 U.S. at 330, 100 S. Ct. at 578 ("State Farm is 'found,' in the sense of doing business, in all 50 States and the District of Columbia. Under appellee's theory, the 'debt' owed to Rush would be 'present' in each of those jurisdictions simultaneously. It is apparent that such a 'contact' can have no jurisdictional significance."). But maintenance of such a suit in Minnesota, where appellants knew Ameriprise to be headquartered, does not offend due process.

## III.

Lastly, we consider whether Minnesota or Texas exemption law should apply in this case. Appellants argue that "Minnesota's choice-of-law rules require the application of Texas law to [their] exemption claims" and that, under Texas law, "the annuity is wholly exempt from garnishment." Choice-of-law questions are reviewed de novo. *Schumacher v. Schumacher*, 676 N.W.2d 685, 690 (Minn. App. 2004).

The term "exemption" refers to property that "is not liable to attachment, garnishment, or sale on any final process, issued from any court." Minn. Stat. § 550.37, subd. 1 (2014); *see also* Minn. Const. art. I, § 12 ("A reasonable amount of property shall be exempt from seizure or sale for the payment of any debt or liability."). Minnesota and Texas each exempt annuities from attachment in garnishment proceedings; however, Texas law "fully exempt[s]" annuities, whereas Minnesota law only exempts annuities "up to a present value of $69,000." Tex. Ins. Code. Ann. § 1108.051, subd. (b)(2)(A)

27

(2003); Minn. Stat. § 550.37, subd. 24. Thus, the exemption laws of Minnesota and Texas are inconsistent.

In *Milkovich v. Saari*, the Minnesota Supreme Court adopted a five-factor test to be used when selecting the applicable substantive rule in a conflict-of-law situation, which considers predictability of results, maintenance of interstate and international order, simplification of the judicial task, advancement of the forum's governmental interests, and application of the better rule of law. 295 Minn. 155, 161, 203 N.W.2d 408, 412 (1973). Appellants rely on that five-factor test to support their contention that Texas exemption law should be applied in this case. We question that reliance because the Minnesota Supreme Court has not extended the five-factor test to matters of procedure and remedies. Instead, the supreme court follows "the almost universal rule that matters of procedure and remedies [are] governed by the law of the forum state." *Davis v. Furlong*, 328 N.W.2d 150, 153 (Minn. 1983) (refusing to extend the five-factor test to conflicts of procedure); *see Weston v. Jones*, 160 Minn. 32, 35, 199 N.W. 431, 432-33 (1924) (describing as "fundamental [the] principle that remedies are governed by the law of the forum").

In *Wendell v. Lebon*, the Minnesota Supreme Court emphasized that the law of the forum governs the remedy in a proceeding to attach property in satisfaction of a debt. 30 Minn. 234, 239, 15 N.W. 109, 112 (1883). In *Wendell*, Illinois plaintiffs brought an action against a Minnesota defendant to recover the value of goods that plaintiffs sold to defendant. *Id.* at 235, 15 N.W. at 109. Plaintiffs levied an attachment on the defendant's property, and defendant obtained an order dissolving the attachment under Minnesota's

28

insolvency laws.  *Id.*, 15 N.W. at 109-10.  Plaintiffs appealed, arguing, in part, that although the insolvency law may have been valid as between citizens of Minnesota, it was void as against citizens of other states.  *Id.* at 238, 15 N.W. at 111.  The supreme court rejected that argument, stating:

> The provision of the law to the effect that [an] assignment made by [the garnishment debtor] within 10 days after the levy of [an] attachment upon the [garnishment debtor's] property dissolves the attachment . . . is a matter relating wholly to the remedy, and [it] is entirely within the control of the forum. . . . The law of the forum governs the remedy.  The attachment belongs to the matter of the remedy.

*Id.* at 239, 15 N.W. at 112.

The United States Supreme Court has similarly stated that "[e]xemption laws . . . are part of the remedy, and subject to the law of the forum."  *Sturm*, 174 U.S. at 717, 19 S. Ct. at 800.  And the principle that exemption laws are remedial and therefore subject to the law of the forum state is embodied in the Restatement (Second) of Conflict of Laws § 132 (1971), which provides:

> The local law of the forum determines what property of a debtor within the state is exempt from execution unless another state, by reason of such circumstances as the domicile of the creditor and debtor within its territory, has the dominant interest in the question of exemption.  In that event, the local law of the other state will be applied.[4]

Although respondents do not directly cite the Restatement in their brief, they rely on the general rule that, because exemptions are remedial, the law of the forum state governs exemptions.  *See, e.g.*, *Clark v. Wilbur*, 913 F.Supp. 463, 467 (S.D. W. Va.

---

[4] Because the issue is not before us and it is not necessary to the resolution of this case, we do not consider adoption of Restatement (Second) of Conflict of Laws § 132.

1996) ("The mandate requiring resort to the law of the state where the district court is held applies to questions relating to whether assets are exempt from collection."), *aff'd sub nom. Clark v. Allen*, 139 F.3d 888 (4th Cir. 1998) (relying on Fed. R. Civ. P. 69(a), which provides that "The procedure on execution [of a money judgment]—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located."); *Garrett*, 490 P.2d. at 315 ("Colorado follows the general rule that exemption laws have no extraterritorial effect."); *Sherwin-Williams Co. v. Morris*, 156 S.W.2d 350, 352 (Tenn. Ct. App. 1941) ("Questions of exemptions are to be determined solely by the laws of the forum."). We note that Texas follows the general rule embodied in the Restatement. *See Bergman v. Bergman*, 888 S.W.2d 580, 585 (Tex. App. 1994) ("Because the Supreme Court of Texas has favored the formulations of Restatement (Second) of Conflict of Laws, and because we feel the rule of Section 132 embodies the holdings in [Texas precedent], we will apply the Restatement rule.").

In conclusion, the general rule that exemptions are determined solely by the law of the forum is consistent with Minnesota precedent and with our supreme court's refusal to apply the five-factor conflict-of-law test to matters of procedure and remedies. The general rule therefore controls, and the district court did not err by applying Minnesota exemption law.

## DECISION

Under the jurisdictional rule governing attachment of debts, the district court had in rem jurisdiction in the underlying garnishment action because appellants could have

sued Ameriprise in an action regarding their Ameriprise account in Minnesota, Minnesota law authorized attachment of the account, and Ameriprise was subject to the district court's jurisdiction. Moreover, the district court's exercise of in rem jurisdiction to enforce respondents' existing foreign judgment is consistent with due process because appellants opened and maintained an Ameriprise account knowing that Ameriprise had its headquarters in Minnesota and expected communications and litigation with its account holders to occur in Minnesota. Lastly, the district court properly applied Minnesota's exemption law, and not the law of Texas, based on the general rule that exemptions are determined solely by the law of the forum.

**Affirmed.**